[Crim. No. 5763.   Second Dist., Div. Three.   Dec. 27, 1957.]

THE PEOPLE, Respondent, v. CHARLES H. FARNELL, Appellant.

Bonpane & Dillon and Blase A. Bonpane for Appellant.

Edmund G. Brown, Attorney General, and Joan D. Gross, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—By indictment defendant was accused of burglary. In a jury trial he was convicted. He appeals from the judgment and the order denying his motion for a new trial.

On June 2, 1955, about 6 p. m., the owner of the Campus Camera Shop, on Broxton Avenue in Westwood Village, closed and locked the shop. The next morning about 9 o'clock, when he returned to the shop he noticed that the back door had been broken and was open, that a lot of merchandise had been strewn on the floor, and that cameras and photography equipment of the approximate value of $9,500 had been stolen from the shop. He identified a Leica camera, a Bolex camera, a Pan-Cinor lens, a Cine-Kodak lens, and a Revere projector (Exhibits 2, 3, 4, 5, 6) as articles which had been stolen from his shop.

On June 3, 1955, the defendant, who was a policeman of the city of Los Angeles, was assigned to duty on the morning watch, from 1 a. m. to 9 a. m., as a patrolman on a beat covering the Westwood Village area.

Officer Sherrill, a field supervisor of patrolmen, called as a witness by the People, testified that on the morning watch of said June 3 defendant was on duty on that beat.

Officers Lievan, King, Anderson and Kinney went to defendant's home in El Segundo on October 28, 1955, and after one of them knocked on the door the defendant came to the door. Kinney told him that they wanted to come in and check the house. Defendant told them to come in. After they were in the house, Anderson told defendant that they wanted to search the house. Defendant told them to go ahead. Lievan saw a planter in a dining alcove or "L-shaped" portion of the living room, which planter was about 3 feet high, 4 feet long, and 8 inches wide. There was a removable galvanized

trough in the top of the planter. Lievan and King removed the trough. A two-by-four (piece of lumber) was lying, on its four-inch side, inside the wood part of the planter. On each side of the two-by-four the investigating officers saw the reflection of "chrome items." After removing the two-by-four the officers saw cameras and photography equipment there. The planter was of such a depth that those articles could not be reached by hand, but by using a spoon which was about a foot long the articles were removed. The articles were the cameras and lenses (received as exhibits herein) which were identified by the owner of the Campus Camera Shop as things that were stolen from his shop. Officer Lievan found the projector (received in evidence herein) under a built-in seat in the breakfast nook.

On cross-examination, Officer Lievan testified that he and Officer King had gone to defendant's house on prior occasions, namely, October 23, 25, and 26; on October 25, about 8:30 p. m., they talked with defendant in front of his house and told him they wanted to go into his house and look around; defendant said that if they would tell him what they wanted he would get it for them; they told him that they would rather not reveal the items they were looking for; with his permission they went into the house; they were there until approximately 11:30 p. m., and during that time they took several things from the garage and house and put them in the patrol car; defendant accompanied the officers when they went to the police station; he was detained at the station; at the request of the officers, defendant gave his garage key to them; about 1:30 a. m. on October 26 (about two hours after the officers had been there on October 25) the officers returned to defendant's house and told defendant's wife that they would like to take some more things and they wanted her to be present while they took them; they took more things from the garage and the house; defendant was not present at that time.

Officer Anderson testified that he was present when the planter was searched and when the cameras, lenses, and projector were found; while he and defendant were at the house, after those things had been found, he asked defendant where he had acquired them; defendant replied that he had found them in an alley off Broxton Avenue in Westwood Village several months previously while he was walking the beat; he asked defendant why the articles were in the planter; defendant said, "It is obvious."

Defendant testified that he was a policeman about nine

years; on October 25, 1955, Officers Lievan and King came to his home, searched the house and garage, and took many articles away, including photography and automobile equipment and carpenter tools; they searched about three hours and then took him to the police station where he was detained; at the station, in response to their request, he gave them his garage keys; when he was released, the following day, he returned home and found that many other articles were missing from his house and garage; two days later his wife told him that someone had telephoned and said that some officers were coming to their house to take everything that was not tied down; then, since he did not want to lose certain film which was in his cameras, he hid the cameras and lenses (exhibits in evidence) in the planter and he hid the projector under the seat in the breakfast nook; he also hid some carpenter tools in a wood pile in the back yard, and he hid some tools between mattresses in the garage; later that day, after he had hidden those things, four officers came to his home and searched the house and took the things which were in the planter and breakfast nook; those things were in a cupboard on October 25 and 26 when the first search was made; the expression "It was obvious," as used by him in response to a question by an officer, meant that it was obvious that the officers were coming to take everything; on June 3 he answered roll call at the police station at 12:15 a. m., and was assigned to walk the beat in Westwood Village; that he went in his automobile to a certain intersection in the village, parked his car, went to a police call box and made his usual report to the station; as he was leaving the call box, Sergeant Sherrill (supervisor of police, who was in a radio car) drove by and told defendant to get into the radio car and ride with him during the night; defendant asked Sherrill if he (defendant) could park his own car at another intersection so that it would be more convenient for Sherrill to return defendant to his car after they had patrolled in the radio car; after defendant had parked his car at that intersection, defendant rode with Sherrill in the Bel Air area during the night, and at 5:30 a. m. they returned to defendant's car; defendant was due at the station at 6 a. m. to get a radio car for use until 9 a. m. when his shift would end; after 5:30 a. m. and prior to returning to the station at 6 a. m., he drove his own car through several alleys in Westwood; in the center of an alley he saw a shiny object and he picked it up; it was a lens (Cine-Kodak lens) and he thought he was lucky; he looked around

and found the other photographic articles (exhibits herein) next to a building, and he put the articles in his car; he thought the articles had been lost or stolen from a car around there and he looked to see if any car had been broken into; he called the station and asked the record identification department to check the numbers of the Leica and Bolex cameras; the department did not have a record of them; he returned to the station at 6 a. m. and parked his car, leaving the articles in it; he left the station in a one-man radio car about 6:15 a. m. and returned to the station at 9 a. m. and went off duty; he took the articles to his home and put them in the cupboard; he had never been in the Campus Camera Shop and did not participate in taking anything from that shop; he had walked the Westwood Village beat about three times; he did not know anything about the burglary of the camera shop until October 25 when officers at the station asked him questions.

On cross-examination he testified that he did not see any scratches on the lens which he found on the pavement in the alley; he knew that the articles he found were valuable; he has been interested in camera equipment since 1940; he did not know that the Leica is one of the best cameras; when he saw the cameras and the equipment in the alley it did not occur to him that a burglary had been committed around there. The deputy district attorney asked him as follows: "Was it after the telephone call [to his wife] that you sawed up the furniture in your dining room and built a fire?" Defendant's counsel objected to the question upon the ground that it was not relevant or material to the issues. The objection was overruled. Defendant answered, "No." Then the following questions were asked and the following answers were given: "Q. The furniture was sawed up, wasn't it? A. What furniture? Q. The cherry wood furniture. A. I had sold my furniture. Q. Didn't the officers remove furniture from your home on the 28th of October? A. No, they didn't—oh, wait a minute, yes; they took one bureau dresser drawer. Q. And they also removed furniture that was sawed up, didn't they? A. I believe they took some seats; I was going to build some furniture. Q. You sawed up that furniture, didn't you? A. No, sir. Q. Who did? A. What furniture was sawed up? Q. Cherry wood furniture. A. Cherry wood or what furniture, I don't know. Q. You had cherry wood furniture in your dining room when the officers were there on October 25th didn't you? A. No, sir. Q. You had furniture in the dining

room when they were there? A. I had furniture, yes." He testified further that that furniture was not there when the officers came on October 28; he had sold it; he needed money to make bail. Then the deputy asked: "Q. You had a stack of wood there that was sawed up furniture, isn't that true? A. No, I had a stack of wood there that was all kinds of wood. Q. Part of it was furniture, wasn't that true? A. There was some seats there that I was going to build, going to build furniture with; furnish my den. Q. Part of that was furniture that was sawed up before the officers got there, isn't that true? A. I couldn't tell you whether that was furniture that was sawed up or what. I had all kinds of wood sawed up there. In fact, I got some wood out of the field behind my house and sawed it up." Defendant testified further that when the officers took him to the police station on October 25 he had a five-hour conversation at the station with certain other officers about burglaries, stolen property, and other property; he (defendant) did not tell those officers in that conversation that he had found the camera equipment in the alley.

Officer Lievan, called by the People on rebuttal, testified, over objections by defendant, that on October 28 there was no furniture in defendant's dining room; that the cherry wood dining furniture, which he had seen in the dining room on October 25, had been sawed, was broken and was in a dismantled condition; and that October 28 was a warm day. The deputy district attorney asked the witness if he saw any fires at defendant's home on October 28. The witness testified, over objection by defendant, that there was a fire in the fireplace in the house, and a fire in the incinerator at the rear of the lot. The deputy asked what was burned in those fires. The witness replied that he could not distinguish anything that was burning in the fireplace; that in the incinerator there was a partially charred board that resembled the type of board that would be used in furniture making. The witness testified that he took some of the furniture (which he saw on October 28) to the police station and he caused pictures to be taken of it. Defendant's counsel made a motion to strike out the testimony regarding the furniture and its condition on the ground that the testimony was prejudicial, immaterial and incompetent, that there was no charge of having taken furniture, and there was no evidence of any burglary wherein furniture was taken. The trial judge ruled that the line of inquiry was relevant and admissible. The judge stated (out-

side the presence of the jury) that the building of two fires on a hot day suggested means of eliminating cartons and identifying tags from the photographic equipment, and the building of the fires suggested that the telephone call (by someone to the wife) was for the purpose of warning defendant to eliminate incriminating articles and documents. The judge, after referring to defendant's testimony to the effect that he did not build a fire with the dining room furniture, said that the inquiry (regarding furniture) was proper impeachment. Defendant's counsel argued to the effect that the alleged impeachment pertained to immaterial matter. The objection was overruled.

In response to questions by the deputy district attorney the witness Lievan testified that nine photographs (Exhibits 7 to 15 inclusive), which were shown to him at the trial, were the photographs of parts of furniture that were taken from defendant's home to the police station. Those were photographs of a table top, table leaves, chair seats, four parts of a round table top, a part of a buffet, the underside of four parts of a round table top, and a chest of drawers.

Then, at the request of the deputy, parts of furniture which were shown in the photographs were brought into the courtroom. The parts were shown to the witness Lievan and he identified them as some of the pieces of furniture that were taken by the police from defendant's home to the police station. The pieces of furniture that were taken from the home were loaded into a truck and taken to the station. The deputy asked the witness to untie certain pieces of furniture and lay them on the floor of the courtroom. Thereupon the witness arranged the pieces of furniture in certain positions upon the floor, and then the deputy asked him if he could identify them as having been taken from defendant's home. Counsel for defendant objected to the witness placing the pieces in certain arrangements. The objection was overruled. Thereupon the deputy asked that the record show that the six pieces of boards "now matched as three boards."

On cross-examination, Officer Lievan testified that only the table top, in four sections, and the chest of drawers were taken from inside the house; that the other pieces of wood (except a table leaf, which was in the garage) were in a pile of wood outside the house and were partially covered by other wood. When the photographs and the parts of furniture were offered in evidence, counsel for defendant objected to the offer on the ground that the photographs and furniture were

immaterial and not related to the issues of the case. The objections were overruled. The deputy district attorney devoted an extensive part of the trial to questions regarding furniture. His questions and the answers thereto comprise about 35 pages of the reporter's transcript.

Officer King testified, on rebuttal, that on October 28 there was a smoldering fire in the incinerator which was in the rear yard of defendant's home; he (witness) removed two pieces of wood from the incinerator; one of those pieces (charred wood) is a part of Exhibit 19.

Officer Gebhart testified, on rebuttal, that on October 25 he and other officers had a conversation with defendant, and at that time Officer Hartgrove told defendant that he (officer) wanted all the photographic equipment which was involved in the burglaries; defendant replied that the officer had all of defendant's photographic equipment; the officer asked if defendant knew that other photographic equipment was outstanding; defendant replied, "No."

Defendant testified, on surrebuttal, that normally at his house, at the beach, it is chilly in the mornings and his boy turns on the heater in the front room and also burns paper that is in the fireplace; also in the mornings the boy burns trash in the incinerator; defendant did not burn anything in the incinerator on October 28 before the officers arrived; he built the den which is a part of his house and he stacked lumber by the fence; from time to time he uses the lumber for building and stuff like that; he cut a table top evenly into four sections and he intended to use the sections in making a four-section coffee table; the parts of furniture, which were in the courtroom, were parts of damaged furniture which he thought he might use to build an ottoman or something; he did not attempt to cause the disappearance of any furniture.

Appellant contends that the court erred prejudicially in permitting the prosecution to cross-examine him, over his objection, relative to furniture, sawing furniture, and having fires in the fireplace and incinerator. He argues that such questions related to collateral and immaterial matters which were not included in his direct testimony and were not within the issues on the charge of burglary wherein only photographic equipment was stolen. Preceding the asking of those questions the deputy district attorney asked what defendant did on October 28 after the telephone call to his wife, and he also asked whether that day was a hot day. After defendant had answered that he could not say whether it was a hot day,

the deputy asked: "Was it after the phone call that you sawed up the furniture in your dining room and built a fire?" The respondent (People) argues that the question of the deputy regarding the temperature on October 28 was "relevant to test defendant's power of recall"; that when defendant testified he could not recall whether it was a hot day, the deputy had the right to ask him about the fire; and that the fire might have been an indication of guilt in that defendant might have been destroying incriminating evidence. The defendant had not said anything on direct examination about furniture, sawing furniture, building a fire, or the weather conditions. The prosecution, in presenting its case, had not offered any evidence to the effect that any furniture had been taken in the burglary alleged or in any burglary, or that any furniture had been stolen. The questions on cross-examination about sawing furniture and building fires were not material on the issue before the court, namely, whether defendant entered the camera shop and took photographic equipment therefrom or whether he aided someone in doing so. The matter as to whether October 28 was a hot day was not of sufficient importance, upon the charge of burglary not involving furniture, to justify the prosecution in testing defendant's "power of recall" by asking him whether he sawed furniture and built fires with it on that day. Those questions on cross-examination were not proper for impeachment purposes. ▮ "A witness may not be impeached on an immaterial or collateral matter." (*People* v. *Burness*, 53 Cal.App.2d 214, 220 [127 P.2d 623, 626].) ▮ In *People* v. *Burness*, *supra*, it was said at pages 220 and 221: "It is not competent for the prosecutor to introduce irrelevant evidence falling short of crime and designed merely to degrade and prejudice the defendant in the minds of the jury [citations]. There was not the slightest proof that the Zephyr wheels were stolen property or that they had been acquired by defendant from the witness Estes or that they had any connection whatsoever with the issues being tried." In *People* v. *Malicoat*, 89 Cal.App.2d 742 [201 P.2d 850], it was said at page 744: "The scope of the cross-examination of a witness is specifically limited by Code of Civil Procedure, section 2048 to 'any facts stated in his direct examination or connected therewith.' The matters opened on cross-examination had no logical connection with the conversation which the witness testified to on her direct examination and tended in no

way to impeach or contradict that testimony. It was therefore error to permit this cross-examination.''

█ Appellant also contends that the court erred prejudicially in permitting the prosecution to present evidence, in rebuttal, over defendant's objections, as to sawing furniture and building fires. The testimony of defendant regarding the furniture and fires was before the court by reason of improper cross-examination and such testimony was immaterial upon the charge of burglary. It was error to permit the prosecution to present such evidence on rebuttal. The evidence on behalf of the prosecution, with respect to the fires, was that the fires were smoldering and nothing in the fireplace was distinguishable and there was a charred furniture-type board in the incinerator. There was no evidence, on behalf of the prosecution or at all, that that board or any furniture was connected with the burglary. The extended questioning on rebuttal regarding the furniture and fires, and the presentation on rebuttal of many photographs of pieces of furniture, and the presentation of many pieces of furniture and the exhibition and arrangement thereof on the courtroom floor, constituted error which aggravated the preceding error in cross-examination. In *People* v. *Adams,* 76 Cal.App. 178 [244 P. 114], it was said at page 184: ''It is well settled that the guilt of a defendant on trial for an alleged crime cannot be established by proof of general bad character or of other crimes or wrongful acts which have no relevancy to the crime charged, nor may a witness be impeached 'by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony.' [Citation.] This statutory rule is so clear and certain that it is deemed unnecessary to cite any of the numerous cases holding that the statute means precisely what is stated therein.''

█ The errors in cross-examination and in rebuttal were further aggravated by statements of the deputy district attorney in his argument to the jury, wherein he referred to the furniture and the fires. The deputy said: ''One other thing that I think you should consider in this case when you go to the jury room is the question of this furniture. We have had some photographs which I think were marked 7 on up, and there is some furniture. Take those Exhibits into the jury room. Look at them. Consider the fact that there were fires going on a hot day on October 28th when the officers returned. Ask yourself why were those fires on. What was he

burning? Why was he burning it? Why was he cutting up this furniture? He was destroying evidence and that is the purpose for which he secreted in the planter and under the seat of the breakfast nook the camera equipment which we have here. They tie in together. Together! Destroy! Destroy! So I won't get myself in trouble. Destroy it. Destroy all evidence. Hide it so that the police can't get ahold of it. Ask yourself those questions when you go to the jury room. Look at those Exhibits. I am not a carpenter but I have seen coffee tables, and I would like to see the one that he was going to make with this furniture cut up in this manner. Look at it. It is new furniture that has been cut up. Consider why he cut that up in relation to why he hid the cameras, the lens and the Revere projector.'' Counsel for defendant had objected repeatedly to cross-examination and rebuttal with respect to the furniture and the fires. His objections were overruled. Under such circumstances, even though counsel for the defendant did not object to the argument of the deputy district attorney, he is not precluded from asserting that the argument was improper.

The improper cross-examination, improper rebuttal, and improper argument to the jury constituted prejudicial error.

Counsel for defendant, in making his objections to the testimony regarding the furniture and fires, argued that such testimony did not tend to connect defendant with the burglary wherein only photographic equipment was taken; and that such testimony might be material and have some significance in another type of case. Defendant was involved in wrongful acts with respect to the cameras and photographic equipment, but the issue herein was whether he committed the burglary of the camera shop. The prosecution's many references to furniture and fires deprived defendant of a fair trial upon the charge of burglary.

The judgment and the order denying the motion for a new trial are reversed, and the cause is remanded for a new trial.

Shinn, P. J., and Vallée, J., concurred.