[Crim. No. 7577. Second Dist., Div. Three. Nov. 8, 1961.]

THE PEOPLE, Respondent, v. ARMAND CARL MULVEY, Appellant.

Armand Carl Mulvey, in pro. per., for Appellant.

Stanley Mosk, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

THE COURT.—In a jury trial Armand Carl Mulvey was convicted of the possession of marijuana and was sentenced to state prison. It was charged in the information that he had previously served a term in state prison following a conviction of forgery. No disposition was made of the former conviction. Mulvey was represented by counsel at the trial; he made a motion for new trial, which was denied, and he filed in propria persona his notice of appeal from the judgment and the order denying his motion. Upon his application we appointed counsel, who has furnished us with a comprehensive

report and analysis of the evidence and other trial proceedings, including the instructions, which concludes with the statement that in his opinion there is no basis for the appeal. After reading the record we were originally of the same opinion. Defendant was so notified and he filed a brief. We affirmed the judgment and in due time, of our own motion, granted a rehearing.

There was evidence of the following facts. Defendant lived with his wife and two children in a large house divided into apartments and single rooms, in which also were living about a dozen adults and children, including two brothers of defendant and the wife and children of one of the brothers.

The evening before defendant's arrest he had an altercation with his wife; she left the house and went to the home of one Bill Takahashi, a family friend, where she spent the night. Takahashi told her that defendant had marijuana in his house and persuaded her to inform the police of that fact, which she did by telephone from Takahashi's house. She then returned to her home and explained to defendant that she had spent the night with a girl friend. A few minutes thereafter Police Officers Hanks and Beckmann appeared at the door, identified themselves, were admitted by defendant and upon request were given permission to search the premises for narcotics, defendant telling them they would find nothing. Beneath the stove the officers found five sacks of marijuana. They asked defendant if there was any more and defendant answered by going to the sink from which he removed another sack which contained pills, that were found to be nonnarcotic, and five marijuana cigarettes. Questioned by the officers defendant admitted that all the contraband was his. He was thereupon arrested, handcuffed to a chair and then taken to police headquarters, where he was again interviewed and admitted that the material the officers had found belonged to him, that he had recently purchased it and had given some of it away. The officers testified that defendant's admissions were made freely and voluntarily. The admissions as testified to by Officer Hanks were corroborated by defendant in his testimony, in all essential particulars. This interview was tape-recorded and certain portions of it were placed in evidence.

Mrs. Mulvey testified that she had been running around with Takahashi and was separated from her husband for three or four days, which she had spent in Takahashi's home; she was "in love with him or something." After defendant's

arrest she was informed by Takahashi that he had planted the marijuana in defendant's house. She had a falling out with Takahashi, and when defendant returned to his home after his arrest she told him of what she had learned from Takahashi with respect to the marijuana. Defendant testified that he went to the police, told them of the foregoing developments and was referred to the district attorney's office. Mrs. Mulvey conferred with the district attorney and was advised to tell her story in court. Defendant also testified that he and his wife went to Takahashi, accused him of planting the marijuana, and endeavored to persuade him to testify to that fact; Takahashi admitted that he had placed the marijuana in the house, but declined to testify. At the time of trial he could not be found.

Defendant testified that the contraband did not belong to him and that he knew nothing about it until it was found by the officers; at the time of his arrest the officers threatened to arrest everyone in the house and to send their children to Juvenile Hall if defendant did not admit ownership of the marijuana; they repeated the threats in the interview at police headquarters; it was wholly because of his desire to protect others than he made the false admissions that the marijuana belonged to him and that he had given some of it away. The officers denied having made threats of any sort.

When the contraband was offered in evidence defendant objected upon the ground that the entry of the house was without his consent and the search of the house was illegal because it had been coerced. Defendant himself testified that he willingly admitted the officers to the house and willingly consented to the search. The objection was properly overruled.

Defendant's brief filed from the county jail makes the point that his rights were ignored in the proceedings had for introduction in evidence of the tape recording. He contends that the preliminary proceedings, consisting of the playing of the tape outside the presence of the jury, was an integral part of the trial from which he was wrongfully excluded, and that this irregularity was one which invalidates the judgment. Officer Hanks produced the recording of the interview. It was offered in evidence by the People. Much of it was unintelligible. There was a discussion of the procedure to be followed, as the result of which the tape was played out of the presence of the jury, but in the presence of the court and counsel. It is not shown where defendant was during this

time, although he testified that he could not hear or understand what was being played. Whether this related to the first playing, or the later playing of portions to the jury does not appear. The purpose of the preliminary playing of the recording was to reach an agreement between counsel with respect to the portions of the recording that would be eliminated. These portions, it was said, related to defendant's past record. While an agreement was reached as to where the tape should be started this was not an agreement by defendant that any part of it could be played. Portions of the recording were intelligible and considerable portions were not. At the bench it was stated to the court that it would require about 15 minutes to play the recording but only three minutes were required for playing the portion the jury heard later.

Defendant objected to having the record played to the jury upon the ground that any admissions which were recorded were not made voluntarily and upon the further ground that so much of the record was unintelligible as to make its submission to the jury unfair to defendant and prejudicial. The objection was overruled and the court stated that defendant would have an opportunity to testify to his version of the entire interview. Officer Hanks had testified to defendant's admissions during the interview and it appears to have been the purpose of the People to introduce the recording as corroborative of his testimony. At the suggestion of the court it was stipulated that the recording as played need not be reported by the court reporter. It does not appear than any transcription of it was ever made.

We are left in the dark as to what the jury learned from the recording, except that Officer Hanks did state that the part that was played was the only part that had any bearing upon the present case.

 We can find no good reason for approval of the practice of playing recordings to juries without preserving a record of the evidence which reaches the jury in this fashion. There is no more justification for it than there would be for the omission from the record of the testimony of material witnesses. Also we regard the playing of records of conversations which are in substantial part indistinguishable as a most unsatisfactory type of evidence. Where only a portion of a mechanically recorded conversation can be reproduced in understandable form its use is not necessarily justified by the fact that the person whose voice is recorded will have an op-

portunity to supply by his testimony portions of the conversation which he claims were not truly recorded. The portions that are so well recorded and transmitted as to carry conviction are manifestly superior proof of what was said. We think great care should be exercised by trial courts with respect to the use of recordings which are in part unintelligible. If it is a recording of a conversation having an important bearing upon the issues it should not be used at all unless it is substantially complete and accurate. In any case, if used, it should be transcribed and made a part of the record.

When arrangements were being made to play the recording outside the presence of the jury the court stated "defendant is remanded"; although it does not appear that he was removed from the courtroom it is clear that he was thereby prevented from hearing the record played.

The fact that legal matters are discussed outside the presence of a defendant furnishes no ground for the claim that he was not present throughout the trial (*People* v. *Teitelbaum*, 163 Cal.App.2d 184 [329 P.2d 157]), but the rule should not be applied to the facts we are considering.

 The procedure was definitely irregular. A record of the oral proceedings should have been preserved in their entirety. Defendant testified that in his interview with the police after his arrest they repeated their threats to arrest others and to take the children to Juvenile Hall unless he admitted ownership of the marijuana. Not only are we uninformed with respect to what was played to the jury, but defendant was not afforded an opportunity to listen to the playing of the entire record to the court and counsel, and to call the attention of his counsel to portions thereof, if any, which might tend to support his testimony that his admissions were not made voluntarily. In the absence of a transcription, which should have been made, it is impossible to know whether the irregular proceedings were harmful.

Although defendant's attorney made no objection to the procedure and defendant did not ask to be present, it must be remembered that the court had ordered in the beginning that defendant be remanded, which no doubt was taken as an order that he not be present to listen to the playing. We cannot say, however, that the enforced absence of defendant while the entire record was being played to the court and counsel was a deprivation of due process or prejudicially

erroneous. Our views might well be different had the proceedings been conducted over the expressed objection of defendant's attorney.

■ In several instances evidence was improperly received. In the cross-examination of defendant he was asked whether during the evening before his arrest he had slapped his wife and ''Well, you were in the back room and there were two girls back there with you and she wanted to go to the bathroom and you wouldn't let her, isn't that right?'' Defendant answered that it was not true, and that they merely had an argument and a scuffle about going to see a picture. In the cross-examination of Mrs. Mulvey she was asked whether it was not a fact that she informed upon her husband ''because he had two prostitutes or two girls in the back room'' and would not allow her to enter the bathroom. She answered that it was not true; that they merely had an argument about going to a show. She was asked whether she had stated to Sergeant Beckmann that she informed upon her husband because he had had two girls in the ''bedroom'' and would not permit her to go to the bathroom. She answered that she did not make that statement. In rebuttal the People called Sergeant Beckmann who testified that Mrs. Mulvey had made the statement. She was also questioned whether she had not told Sergeant Hanks that a bail bondsman was the one who informed on her husband. She answered that she had not made such a statement. Sergeant Hanks was called by the People in rebuttal and testified that she had told him that it was a bail bondsman who gave the information to the police. When Sergeant Beckmann was questioned on rebuttal he was asked ''Did she tell you at that time that she told—— Mr. Baker: I object to that as beginning to be leading.'' The objection was overruled and the remainder of the question concerned the two girls in the ''bedroom.''

No other objection was made to any of this type of cross-examination or to the evidence given in rebuttal. All this questioning related to immaterial matter. It could have served no purpose other than to discredit the defendant by suggesting immoral conduct upon his part due to the supposed presence of two girls in the bedroom. Perhaps referring to them as prostitutes was a slip of the tongue of the prosecutor but we doubt it. There was no excuse whatever for the insinuation. In this cunning fashion the prosecutor succeeded in picturing the defendant as a person of loose morals. The evidence thus adduced had no bearing whatever upon the

question of defendant's guilt; it was highly improper not only to ask the questions but also to introduce contradictory statements made by defendant and his wife. (*People* v. *Lo Cigno,* 193 Cal.App.2d 360, 383 [14 Cal.Rptr. 354] ; *People* v. *Malicoat,* 89 Cal.App.2d 742, 745 [201 P.2d 850] ; *People* v. *Farnell,* 156 Cal.App.2d 393 [319 P.2d 749].)

██ The cross-examination of defendant and his wife with respect to some trouble between them, as suggested by the questioning, cannot be justified. Referring to two girls as ''prostitutes'' was, as we have said, a calculated effort of the district attorney to place emphasis upon the imputation that defendant was a grossly immoral man. Of course, if objection or a motion to strike the testimony had been made, the duty of the court to exclude it would have been irremissible. But the question is whether the harm could have been removed by any ruling or admonition of the court. To be sure the jury would have been told there was no evidence of defendant's misconduct, but that would have meant to the jurors only that misconduct had not been proved. And would not the jurors have reasoned that there must have been misconduct as implied in the district attorney's questions, else he would not have asked them? And who can say the jurors would not have believed that Mulvey testified falsely in denying he had struck his wife, when Officer Beckmann testified that Mrs. Mulvey had said that her husband did have two girls in the bedroom and struck her during an argument? It was an ugly picture which the district attorney succeeded in painting. It was one which would have caused the jurors to look upon the defendant as a despicable character and to regard him with aversion and distrust.

It is often difficult for a reviewing court to determine whether irregularity and misconduct of the type we are considering resulted in harm beyond the reach of the court to correct by an admonition that the matter should be disregarded by the jury and, of course, whether the harm itself was seriously prejudicial. It requires consideration of the entire evidence in the case and an appraisal of the strength of the case as developed in the evidence of the People. Each case stands alone, to be judged on its own facts.

██ When evidence offered by the People tends to prove that the accused had committed other crimes or had been guilty of misconduct seriously reflecting upon his character under a theory that the evidence was relevant to some issue in the case, the question is whether the end justifies the means.

If the harm to the defendant is substantial and the evidence is of little value it should be excluded. The case of the defendant should not be permitted to suffer harm in order that the case of the People might derive some slight benefit from the evidence. (*People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974].)

The cross-examination of Mulvey whether he had not struck his wife the evening before his arrest cannot be defended on any theory. When, on cross-examination, a witness gives answers to questions upon immaterial matters, the questioner is bound by the answers and may not make use of evidence to prove their falsity. (*People* v. *Malicoat, supra,* 89 Cal.App.2d 742; *People* v. *Lo Cigno, supra,* 193 Cal. App.2d 360; *People* v. *Farnell, supra,* 156 Cal.App.2d 393.)

Notwithstanding the denials of Mulvey the district attorney undertook to prove that he had struck his wife by the testimony of Officer Beckmann that Mrs. Mulvey had said so. And notwithstanding the denial of Mrs. Mulvey that her husband had struck her, the testimony of Officer Beckmann was introduced as impeachment.

The theory of the People that the motive of Mrs. Mulvey in informing upon her husband tended to prove that he had knowledge of the existence of the contraband was tenuous, and wholly insufficient to justify evidence of her alleged statements of immoral conduct upon his part, under the guise of impeachment of her testimony.

The reasoning of the People would run somewhat like this: Since Officer Beckmann testified that Mrs. Mulvey had told him defendant had two girls in the bedroom, which caused an altercation in which defendant struck her, she informed on defendant because he had struck her and not because Takahashi had urged her to call the police; therefore, Takahashi had not told her about the marijuana and had not told her that he had planted it, and since he had not planted it under the stove, it belonged to Mulvey; and, anyway, Takahashi was a "fictitious" character.

The evidence against the defendant was circumstantial. That it was ample to justify his conviction cannot be questioned. Neither can it be questioned that the jurors could have reasonably entertained a doubt of his guilt. It was a well-established fact that Takahashi had intruded himself between defendant and his wife, and it would not have been unreasonable for the jurors to believe that he would not have been above planning the removal of Mulvey from the scene

in the manner described by Mrs. Mulvey. The jurors could also have believed the testimony of Mulvey that he admitted ownership of the marijuana under threats of the police that if he denied it others would be arrested.

If none of the evidence as to the presence of two girls in the bedroom had been received the case would have been quite different, and the version of the entire affair given by Mrs. Mulvey would not have been implausible. We mention only the fact that she would have had no reason for desiring to see her husband sent to prison had she not expected that she and her children would be supported by Takahashi. This fact strongly points to the belief that Takahashi took an active part in seeing that Mulvey was turned over to the police. The minds of the jurors would necessarily have been diverted from any such theory of the case by the implication of the improper questioning that Mrs. Mulvey's informing on her husband was due to some misconduct of the latter and not to any plan that she and Takahashi had devised. We cannot doubt that the case of the defendant was seriously prejudiced.

 It is contended that the district attorney was guilty of misconduct in his closing argument to the jury in which he made statements concerning the value of the marijuana that was recovered by the officers. He stated there were 137 grams which would make in his estimation, between 511 and 685 cigarettes; that it is of common knowledge that they run around 50 cents apiece, and that it would amount to about $255 to $342.50 and he added: "Now if a person is going to plant something such as the *fictional Mr. Takahashi* has been accused, does it seem logical and reasonable that he is going to take this quantity, this amount of marijuana that has value to it in order to be relieved of Mr. Mulvey when one cigarette would do the same? Does that make sense? Is he going to spend over $200.00 to get rid of Mr. Mulvey when all he has to do is spend 50¢? There is no logic to that. There is no logic to that whatsoever." It is true that the officers recovered about 137 grams, as well as six wrapped cigarettes, and that Officer Hanks testified that depending upon who rolled them, three to five could be made from one gram, but there was no evidence whatever as to the value of a marijuana cigarette and, of course, it was not a matter of common knowledge that they are worth 50 cents each. There was no evidence of the value of the marijuana itself, and no justification for putting a value of $200 upon the quantity which the officers found.

It may be that the statements of the district attorney were factually correct but that is not the point. It was highly improper for him to give evidence in the case and his statements could not have been understood by the jury otherwise than as facts known to him and which were or should be known by the public generally. It was an impressive argument that $200 worth of marijuana would not have been used to entrap Mulvey when one marijuana cigarette would have accomplished the same purpose. Of course, it cannot be told to what extent the jurors were impressed or convinced by the improper statements, but it is manifest that we cannot say they were not impressed to the prejudice of defendant.

The major difficulty we have encountered on this appeal is that no effective objection, or even proper objection, was made to any of the improper questioning by the district attorney or to his improper statements. Ordinarily, the failure to object is regarded as a waiver of the right to claim misconduct and prejudice (3 Cal.Jur.2d 646), but this is not true if the obvious harm done is irremediable. (*People* v. *Ford*, 89 Cal.App.2d 467 [200 P.2d 867].) We are convinced that any admonition the court could have given would have been ineffective to overcome the harm occasioned by the improper conduct of the district attorney above discussed.

On his motion for new trial defendant presented a number of affidavits and he evidently also presented a letter from Takahashi to Mrs. Mulvey which strongly corroborated the other evidence as to their meretricious relationship. For some unknown reason the letter was not placed in evidence, although it was read by the judge. It is unnecessary to consider defendant's arguments that his motion for new trial should be granted.

The judgment and the order denying motion for new trial are reversed.

A petition for a rehearing was denied November 28, 1961, and respondent's petition for a hearing by the Supreme Court was denied January 9, 1962.