[Crim. No. 7497.   Second Dist., Div. Three.   Sept. 11, 1961.]

THE PEOPLE, Respondent, v. HOWARD NOLAN WOOTAN et al., Defendants; HARRY SIMONS, Appellant.

Harry E. Weiss and Daniel N. Busby for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

SHINN, P. J.—By indictment, Howard Nolan Wootan, Donald Arthur LeCuyer, Harry Simons, Bernard Michael DeLisa and Gene Lawrence Clothier, were accused of conspiring to commit forgery in violation of sections 182 and 470 of the Penal Code. Some 13 overt acts were alleged. In a jury trial, all were convicted. Simons' motion for new trial was denied; he was denied probation and sentenced to state prison. He appeals from the judgment.

There was evidence of the following facts. One Williams was arrested while endeavoring to cash a forged check. He had in his possession other forged checks. Williams at the time was under sentence to state prison for robbery. He agreed to cooperate with the officers of the sheriff's department and he told them the following story, which he also related upon the witness stand. He had known defendant Simons for several years as a bail bond broker in Long Beach, with an office across the street from the sheriff's substation. Simons came to him and offered him an opportunity to make a good deal of money in a way that would be explained to him by a man Simons would send on the following day. Gene Clothier contacted Williams and introduced himself as "Raul." The proposition he explained to Williams was that the latter would be given forged checks to cash, in return for which he would receive 25 per cent of the proceeds. Williams called Simons and was assured that Raul was defendant's man. Shortly thereafter Williams received from Raul several cards of identification, a driver's license and a number of checks, seven of which Williams cashed. He gave the money and the unused checks to Raul. Shortly thereafter he received 25 forged checks from Raul and cashed 19 of them; at the direction of Raul, Williams gave the money and the unused checks to Simons.

Williams was admitted to bail upon the forgery charge. The officers took from him two of the checks, giving him therefor $250 sprinkled with fluorescent powder. They returned the remainder of the checks and gave Williams a transmitting device to be concealed under his shirt, and they arranged for the recording in their office of any conversation that might be transmitted. At the direction of the officers Williams went to the office of defendant, handed him the unused checks which were of Clary Business Machines, and the marked money. He explained to defendant that he had cashed only two of the checks. Defendant paid Williams 40 per cent of the money and put the remainder in his wallet. He placed

the checks in a rear room. The conversation between Williams and defendant was recorded on the officers' machine and was testified to by Officer Hayes. As Williams left defendant's office, the officers entered and questioned defendant. They asked him to produce his wallet, which he did. Defendant's fingers and $145 in bills, under violet ray, showed the presence of fluorescent powder; $700 in bills did not. The bills amounting to $145 bore the serial numbers of the bills the officers had given to Williams. The officers asked permission of defendant to look into the rear room, which was granted. They found 18 blank checks in an envelope marked ''Pacific Finance.'' Defendant was placed under arrest. There was other evidence of a corroborative nature which it is unnecessary to relate, inasmuch as the sufficiency of the evidence is not questioned.

In his testimony at the trial defendant admitted that Raul and Williams had used him as a go-between for the passage of packages, but denied that he had received any money from Williams, or that he had any participation in the check transactions. He knew, however, that checks and money were involved and was greatly worried. He was in fear of Raul and coerced into allowing himself to be used as an intermediary. When Williams gave him money and checks on the day of his arrest he knew the checks were forgeries and that the money was the proceeds of two checks that Williams had cashed. He gave Williams 40 per cent of the money. He kept $145 because Raul owed him $131 as half of Williams' bond premium, which Raul had agreed to pay.

Defendant's first point is that the search of the office and his arrest were without probable cause. As to the search of the premises, it is contended that permission to look into the rear room was coerced and was not a free consent. The evidence was to the contrary. Defendant was not under arrest when he gave the consent. Furthermore, he admitted to the officers that he was being used as an intermediary between Williams and Raul. When first questioned he denied that he had received checks or money from Williams. When the checks were found and the money exhibited he admitted having received them. The entry of defendant's office by Williams was peaceable and the questioning of defendant by the officers was proper. The presence of the checks which they found, and possession of the money which he exhibited to the officers, which was the same as that received from Williams,

and the false denials to the officers, justified defendant's arrest.

Over the objection of defendant, Lieutenant Hayes testified that he was one of the officers who listened in on the transmission. He had a transcript of the recording, which he used during his testimony to refresh his recollection. There were many passages which the transcript designated as unintelligible. The testimony of the officer appears in the reporter's transcript; some of it consisted of reading from the transcript, which the officer testified was identical with the recording and with his recollection of what he had heard.

As related by the witness the subject of money was mentioned in the conversation; it was mentioned that officers assigned to the forgery detail were having a convention; checks of National Cash Register were discussed and were apparently inspected during the conversation; Williams mentioned to defendant that he had cashed only two of the checks; money was counted and a statement was made as to how much Williams should have and defendant should keep; Raul was discussed and Williams said he wished to do further business with Raul, and defendant said he would endeavor to make an appointment with him.

The grounds of objection to the testimony were numerous, one of them being that much of the recording of the conversation was unintelligible. No authority is cited for the proposition that the fact that some of the conversation was missing rendered it inadmissible altogether.

Defendant testified that the transcription, as far as it went, was an accurate account of what was said. Inasmuch as the point is not urged on the appeal that the record of the conversation was so incomplete as to be without evidentiary value, we pass that question without discussion.

Defendant contends that there was no competent evidence of his guilt, first, because the arrest and search were unlawful and, second, because the use of the microphone and tape recorder to obtain evidence was unlawful. We have answered the first contention.

Defendant refers to section 653h of the Penal Code, contending it was violated. It is sufficient to say of the applicability of the section that if Williams had used a dictograph to record his conversation with defendant without the latter's consent he would have been guilty of a misdemeanor. He did not have consent; neither did he have a dictograph. ▮ It was directly held in *People* v. *Albert,* 182 Cal.App.2d 729

[6 Cal.Rptr. 473], that a transmitting and recording device carried on the person is not a dictograph within the meaning of section 653h, whether the recording is by means of a self-contained device or by wire transmission to a recorder at another location.

■ Defendant contends that Williams' entry of the office was unlawful and that, therefore, any evidence obtained thereby was inadmissible. But the entry was not unlawful. Williams was a constant visitor at the office. Defendant expected a visit from Williams with money for Raul. Williams did not obtain admittance by strategy or by fraud. To be sure he did not explain his purpose to defendant, but he had no duty to explain it. ■ When peace officers, or those working with them, engage suspecting persons in conversation for the purpose of obtaining evidence of the commission of a crime, they have no duty to disclose their purpose, and if they conceal what they have no duty to disclose no legal wrong is committed. ■ "When a person discusses the commission of a crime with another, face to face or at a distance through the use of any means of communication, there is no unreasonable violation of privacy when the other uses the conversation against him." (*People* v. *Malotte*, 46 Cal.2d 59 [292 P.2d 517].)

In *On Lee* v. *United States*, 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270], Chin Poy, an old friend, entered the laundry of On Lee with a microphone concealed on his person and a recording device outside to receive messages. On Lee made damaging statement of criminal activity. The recording was used against him. It was held that this did not constitute a trespass or render the evidence inadmissible; it was not illegal. Chin Poy's actions were deceitful, but of this fact the court said: "The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions. But to the extent that the argument for exclusion departs from such orthodox evidentiary canons as relevancy and credibility, it rests solely on the proposition that the Government shall be arbitrarily penalized for the low morals of its informers. However unwilling we as individuals may be to approve conduct such as that of Chin Poy, such disapproval must not be thought to justify a social policy of the magnitude necessary

to arbitrarily exclude otherwise relevant evidence. We think the administration of justice is better served if stratagems such as we have here are regarded as raising, not questions of law, but issues of credibility. We cannot say that testimony such as this shall, as a matter of law, be refused all hearing.''

The cases of unlawful entry, relied upon by defendant, are inapplicable. There was no error in the receipt of the evidence.

■ Contrary to defendant's contention, the fact that Williams was a coconspirator who was cooperating with the police did not render his testimony inadmissible.

The judgment is affirmed.

Ford, J., concurred.