[Crim. No. 4769. First Dist., Div. One. Feb. 24, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. JESSE T. BOWMAN, Defendant and Appellant.

Lucas, Wyckoff, Miller, Stanley & Scott and Jerry L. Stanley for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Derald E. Granberg and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed from a judgment sentencing him to state prison following his conviction by jury verdict of arson in violation of section 447a of the Penal Code.

He contends that evidence of his conversations with alleged accomplices was unlawfully obtained and improperly received in evidence; that there was error in receiving in evidence a witness' opinion as to the location at which the fire started; that the trial judge showed bias and partiality in conducting the proceedings; that the prosecutor's comments violated defendant's constitutional privilege against self-incrimination; that the prosecutor committed other prejudicial misconduct in his argument to the jury; and that the court erred in instructing the jury. An examination of the record and the foregoing contentions, in the light of the principles of law applicable thereto, reveals no prejudicial error which would warrant a reversal and the judgment must be affirmed.

In July 1963 defendant and his wife apparently held title to a house on what is referred to as Justice Lane just off Soquel Drive, or 5229 Soquel Drive, in the area of Santa Cruz County serviced by the Soquel volunteer fire department. The property was subject to a first deed of trust which secured an obligation in the sum of $11,500, on which no more than $100 had been paid on the principal, and a second deed of trust which secured an obligation of $1,500, upon which nothing had been paid.

One Cole, a thrice-convicted felon, first revealed his part in the offense under review, after discussing the matter with his attorney, when arrested on a forgery charge in November 1963. He sought and was granted leniency on the latter charge, and he never was prosecuted for his participation in the burning of defendant's house, or for admittedly setting a fire at another house. He testified as follows: that he had known defendant since 1960; that he had traded pick-up trucks with him in 1962 and received a truck which defendant represented had a trade-in value greatly in excess of that which the witness was able to obtain a month later; that he

was working for defendant in July 1963 doing carpenter work for which defendant owed him a little better than $200; that around the 8th or 10th of July, defendant, in the middle of the day, asked him to leave the job he was working on to go to the Soquel Drive premises; that he accompanied defendant in the latter's vehicle; that in the conversation in the car and at the premises, which they entered through a door from the carport to the kitchen after opening it with a key kept in a can in the carport, defendant told him: that he had put several thousand dollars into remodeling the house; that it had been sitting there for 15 or 18 months and he was unable to move it; that he had $18,000 worth of insurance on the house, as was evidenced by a policy which he took from a drawer in the kitchen and exhibited to Cole; and that he would pay Cole to have it burned down—$500 cash if the insurance paid him less than $12,500, or anything over and above $12,000; and that Cole should be sure defendant was out of town when it happened.

Cole related that he could not remember how long he worked for defendant after the foregoing conversation, probably three or four days, and that he was working on the floors at the job previously referred to at the time defendant went to the hospital; that he saw and conversed with defendant almost every day at one or another of two bars they each frequented; that defendant told him he was going to a hospital in Watsonville, but did not tell him when he would be out; that he did not see defendant at the hospital, but subsequently learned from a conversation with an unidentified man in a bar that defendant was getting out of the hospital the following day.

At the trial Cole recited that Ray Mount and Wayne Cook were with him as lookouts at the time he set the fire. He was unable to remember when he first discussed the matter with either, but indicated that he talked to Mount before Cook, and the latter, in the presence of Mount, shortly before the house was burned—either that evening or a day or so before. He acknowledged he offered $100 to each of them to assist, and told them he was to get $500 for burning the house. According to Mount, who also testified, Cole first told him of the plan to burn the house two or three weeks before the event, and he advised Cole not to do it; and thereafter on the day preceding the fire Cole enlisted the aid of Mount, Cook, and Tommy Crank and offered each of them $100 to assist. Cole testified on direct examination that he had been back to the Bowman house before the fire at a date he could not

remember, but on cross-examination could not recall whether he had returned or not during that interval. Mount, however, placed Cole, himself, Cook and Crank on the premises between 2 and 4 o'clock of the afternoon preceding the blaze. He stated that they walked through the house while Cole looked for a place to start the fire, and that Cole stated he thought he would start it in a closet somewhere right near the kitchen.

Cole gave the following version of the commission of the offense: The four last mentioned were at Cook's home, which was located either three-quarters of a block or about two blocks up and across the road from the Bowman house. Between 2:30 and 3 a.m. Cole went to the carport, secured the key and entered through the door on the back side to a service porch so he could not be seen from the front, and left Mount and Cook as lookouts. He could not recall any prearranged signal, nor could he recall his prior statements to the investigating officer that a party whom he did not wish to identify, but whom he subsequently during the investigation identified as Cook, went under the house and poured a can of lacquer thinner under the floor and lit it. Cole went into the kitchen where some paint was stored, selected a bucket of paint, returned to the service porch, poured the paint in and around the bottom of a small closet, which was just a little bit larger than the size of a hot water heater and which had a vent or hole in the bottom, and set the paint afire with one or more matches. The paint bucket was left in or nearby the closet. He was in the house less than 10 minutes. He could not recollect which door he went out, nor remember whether or not he locked it, but he replaced the key, and returned to Cook's house where he remained for 35 or 40 minutes or so and watched the fire burning and the firemen fighting the fire.

Mount testified that he had known Cole about a year at the time of trial (11 months after the fire) and also knew Bowman. He had not been prosecuted for his admitted part in the offense. He placed Crank at the scene of the blaze, but he did not see where either Cook or Crank went. He confirmed that Cole got the key in the carport and entered the house where he remained not over five minutes while Mount was outside in the carport watching. According to Mount, Cole entered the door from the carport into the kitchen. When he came out he said, "It's set. Let's go," and they walked off.

The assistant chief of the local volunteer fire department, who had participated in fighting at least 30 fires a year for the preceding 20 or 21 years, arrived at the scene at 4:23 a.m.

At that time the fire had a pretty good start through the back of the building. The big flame was through the roof in the middle of the building to the rear and north side between the service porch and the kitchen. After the fire died down he went into the back entry hall. Opposite the door was a wall (south) with a cupboard, and a hot water heater to the left of the cupboard; the door into the kitchen was on the left (east) wall, and between the door (north) and the east wall was a hole in the floor and the remnants of what appeared to have been a cooler with a ventilating hole through the floor. A paint can was lying in front of it with the top tipped toward the aperture in the floor. The witness opined, after reviewing the damage he inspected, that the fire started in the service porch, and that it most likely started on the north wall where it appeared an old type cooler had been. He went back to the premises on two or three occasions, the last of which was two or three weeks after the fire, and the paint can was still there.

A self-employed insurance adjuster testified that he came to the house between 9 and 9:30 a.m. on the morning of the fire. He described the damage and physical condition he witnessed including an overturned paint can in the service porch, and paint, which was partially burned and partially still moist, on the floor next to a hole in the northeast corner of the service porch. No evidence of burning underneath the house was detected except around this hole. He left the paint can on the premises and retrieved it and turned it over to the sheriff on August 12th when he had occasion to investigate a nearby fire where there was evidence of paint burning. He recalled seeing a box with from three to five paint cans in either the kitchen or the carport. He saw defendant on the premises on one or two occasions between the fire and August 12th and told him he thought the fire started where the cooler was but never told him that he thought paint was used to start the fire. His investigation revealed that the gas and electric service were connected and on at the time of the fire.

Cole testified that he saw defendant when he returned from the hospital either the day of the fire or the following day; that he told him how he had set the fire and who was with him; that he had changed his testimony at the preliminary hearing in regard to the place at which this conversation was held because he had been confused when he first testified. He stated that defendant gave him $20 in cash on that occasion; $100 in cash a week or 12 to 13 days later at the job site where he formerly worked; that $40 was later

left at the place where he lived; and that his testimony at the preliminary hearing that the second payment was a check was in error because he was confused about wage payments. In respect of the latter, Cole testified that Bowman settled up what he owed him for wages by checks, one of which was received the weekend before Labor Day; that he could not recollect when other payments were made; that his testimony at the preliminary hearing to the effect that the wages were cleared up around the time of the fire and that the $160 were the only payments he could remember after the fire, was based on a misunderstanding.

Cole acknowledged that he had gone to defendant's house in the company of Mount on at least two other occasions seeking money, and that defendant put him off and said he would get it. Cole could not recollect the times of the foregoing conversations or whether he had any other talks with defendant before his arrest for forgery, but he admitted that between the time of the forgery and the arrest for that charge he asked defendant for enough money to make good on the check he had forged. Cole denied that he threatened defendant with exposing the current charge at that time, or that he told defendant it would cost him $10,000 if he did not get Cole the money he needed.

Mount testified that after the fire Cole paid him $100 in several cash payments, the largest of which were $40, over a period of six weeks; and that he received $50 from Cole for another matter; that between the fire and the time he cooperated with the authorities he had seen defendant three or four times, but had never discussed the fire with him; that he had accompanied Cole to defendant's house and heard Cole say that the defendant owed him money, but did not overhear their conversations; that he talked with defendant in a bar early in December, December 7th, at which time defendant asked him if he knew Cole was in jail, and if he would get word up to Cole that he, Bowman, would do something for him in a few days.

The remaining evidence for the People consists of admissions elicited from the defendant by Cole and Mount at the instigation of the authorities who were investigating the fire and is hereinafter considered. The defendant offered the testimony of Cook's brother that about three months prior to the trial Mount denied a rumor that he was involved in burning Bowman's house, knew anything about it, or had signed any statements in connection with it. Mount had previously explained this and another denial on the grounds that it was

none of either of the interrogators' business. The only other witness for defendant was a character witness who had known him for 15 years.

The foregoing evidence leaves one glaring deficiency. There is an absence of ''independent evidence which of itself connects the defendant with the crime without any aid from the testimony of the accomplice.'' (See *People* v. *Luker* (1965) 63 Cal.2d 464, 469-472 [47 Cal.Rptr. 209, 407 P.2d 9]; Pen. Code, § 1111; *People* v. *Holford* (1965) 63 Cal.2d 74, 80-81 and 82-83 [45 Cal.Rptr. 167, 403 P.2d 423]; *People* v. *Bowley* (1963) 59 Cal.2d 855, 861-863 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178]; *People* v. *Otash* (1960) 186 Cal. App.2d 132, 143-144 [8 Cal.Rptr. 878]; *People* v. *Zelver* (1955) 135 Cal.App.2d 226, 232-234 [287 P.2d 183]; *People* v. *Griffin* (1950) 98 Cal.App.2d 1, 24-29 [219 P.2d 519]; *People* v. *Hanks* (1939) 35 Cal.App.2d 290, 299-300 [95 P.2d 478]; and *People* v. *Thornton* (1927) 85 Cal.App. 648, 652-656 [259 P. 961]; and cf. *People* v. *Brush* (1961) 194 Cal.App.2d 771 [15 Cal.Rptr. 193].) The evidence concerning the alleged admissions of defendant is therefore crucial. (See *People* v. *Smith* (1966) 63 Cal.2d 779, 803 [48 Cal.Rptr. 382, 409 P.2d 222].) It was so appreciated by the jurors who asked for a replay of recordings of two conversations which were admitted in evidence, and who subsequently requested a rereading of the instructions which bore on the credence to be given to the recorded conversations.[1] Inquiry is therefore directed to these statements.

### *There was no error in receiving evidence of defendant's conversations with his accomplices*

Following Cole's revelation of the crime he was requested by representatives of the district attorney's and sheriff's offices to make two different telephone calls to the defendant. He acquiesced, made the calls, consented to eavesdropping and recording by the authorities and verified that the tape produced by the prosecution accurately transcribed the conversations. Cole was not told exactly why they wanted him to make the telephone calls or what to say, but he assumed that they wanted him to get evidence against Bowman, and he

---

[1]The trial judge after conferring with counsel repeated an instruction given at the request of the prosecution which read: ''The defendant's admissions, active and passive, and his declarations may constitute corroboration'' (see *People* v. *Otash* (1960) 186 Cal.App.2d 132, 143-144 [8 Cal.Rptr. 878]); and reiterated standard instructions concerning admissions (see CALJIC (1962) No. 29-A.1 (new) and (1958) No. 29-D). On further inquiry he described ''active'' and ''passive'' as used in the first instruction as ''direct'' and ''indirect.''

did it with the hope he would be granted leniency on the forgery charge.

A representative of the sheriff's office testified that the tape, the custody of which was verified by him and the district attorney, was an accurate reproduction of the conversations he overheard between Cole and the defendant on December 7 and December 18, 1963. It was stipulated that the defendant never knew of or consented to the recording of the conversation. The record does not reflect that defendant consented to eavesdropping by the authorities, or that they ever advised him of his right to counsel or right to remain silent.

The salient parts of the first conversation read as follows: "FIRST VOICE [Cole]: . . . I am going to have to have that money that you owe me to pay this lawyer before I can get him to do anything on this case. SECOND VOICE [defendant]: Yeah. Well, it looks like it's going to be Wednesday before anything is going to come through at all. FIRST VOICE: Well, the last time I talked to you you said that they would be settled with you on that other deal, on the insurance. SECOND VOICE: Well, they haven't. FIRST VOICE: Yeah. SECOND VOICE: And I'm hoping, but when? FIRST VOICE: Well, how much did you turn in for on it? SECOND VOICE: It's going to run around ten five. FIRST VOICE: Ten five? SECOND VOICE: Ten three six five is what I happen to get. FIRST VOICE: Well, you're still going to give me the five hundred, ain't you? SECOND VOICE: I'm going to give you your share of it."

"SECOND VOICE: . . . I can't do a thing until I get that and I'll start paying off what I owe but I can't do anything otherwise. FIRST VOICE: Well, this has been about five months now, Jess, and you know I gave Ray and them some money out of my own check and all you ever gave me was a hundred and sixty dollars so far and that—I need it bad now. Looks like you could go borrow it or something. SECOND VOICE: No, I can't do a thing until I get that check and then I'll pay you what I owe you. . . ."

"FIRST VOICE: Then I can look for some money in a couple of weeks? SECOND VOICE: Yeah. But not over the—until I get this thing settled and I'll pay you off the same as the other guys. But it will be a week or ten days before I can pay anybody off."

"SECOND VOICE: I'm going to do all I can, just whatever

comes out and I'm going to pay each guy what I owe—as much as I can.''

On December 18th the conversation reflects the following: ''FIRST VOICE: You told me the 18th that you'd have me some money up here. SECOND VOICE: Well, Al, I haven't even got four bits. I think maybe tomorrow, the next day, and Ray's supposed to come and see you. FIRST VOICE: Well, I'm making arrangements now for Ray to come back and see you, Jess. SECOND VOICE: Well, that's good.''

. . . . . . . . . . .

''FIRST VOICE: I wouldn't have set that fire in the first place except for the money that was in it. SECOND VOICE: Quit talking. I haven't got a damn nickel either and you can go any way you want to. FIRST VOICE: Well, if you don't come up with the money I'm just going to pull the pin on you, that's all. SECOND VOICE: Well, just go ahead. That's nothing, ever [sic] one penny came in on it. FIRST VOICE: This has been way back in July. SECOND VOICE: That's right, and it's still that way. Quit talking like you're talking. I told Ray Sunday how we're sitting. FIRST VOICE: I'm sitting up here tight. You guys are sitting out there running around loose. SECOND VOICE: Well, you just go ahead and do whatever you want to but as far as I'm concerned I'll do what I told you I would just as soon as I could and that's it. FIRST VOICE: Well, so far, Jess, you haven't done what you said you'd do, actually. You always come up with one excuse to the next. SECOND VOICE: No, it's the same excuse. It's that way. You are talking a lot. It's probably wired. FIRST VOICE: Oh, no. SECOND VOICE: And I told Ray. I saw him Sunday.'' In this conversation defendant was also advised that Cole had made arrangements for Mount to see defendant that evening.

With commendable perception court and counsel were aware of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] two days after it was decided. The court limited its application to the situation, posed by the facts therein, where the declarant already had counsel and was denied the opportunity to consult with him. (378 U.S. at pp. 479-482; and see also *Massiah* v. *United States* (1964) 377 U.S. 201, 206 [84 S.Ct. 1199, 12 L.Ed.2d 246].) The court envisioned but did not presage the adoption of the principle enunciated in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and relied on herein, that where an investigation has progressed to the accusatory stage, statements elicited from an accused without informing him of his right to counsel and right to remain silent should not

be admitted against him without proof of waiver of those rights. (62 Cal.2d at pp. 353-354.)

Herein a determination is sought that the conversations in question offend *Dorado* because the declarant defendant was not informed of his rights.[2] ■ On the one hand, it is clear from *Massiah* that once a defendant is formally charged and has counsel, statements which are thereafter surreptitiously obtained may not be used against him. (377 U.S. 201, 206; and see *People* v. *Arguello* (1965) 63 Cal.2d 566, 571-572 [47 Cal.Rptr. 485, 407 P.2d 661].) Similar considerations whether predicated on *Dorado* or *Massiah* preclude use of statements obtained by the prosecuting authorities from the accused by subterfuge before charges have been filed but after he has been taken into custody. (See *People* v. *Ludlum* (1965) 236 Cal.App.2d 813, 815-816 [46 Cal.Rptr. 375]; *People* v. *Flores* (1965) 236 Cal.App.2d 807, 810-812 [46 Cal.Rptr. 412]; and cf. *People* v. *Lopez* (1963) 60 Cal.2d 223, 239-240 and 247-248 [32 Cal.Rptr. 424, 384 P.2d 16] with *In re Lopez* (1965) 62 Cal.2d 368, 370-372 [42 Cal.Rptr. 188, 398 P.2d 380].) ■ On the other hand, statements made voluntarily, without the connivance of the prosecuting authorities, by an accused who is in custody to a fellow inmate or a confederate are not subject to *Massiah* or *Dorado* and may be used against him whether proved by the testimony of the intended auditor (*People* v. *Teale* (1965) 63 Cal.2d 178, 184-186 and 195-196 [45 Cal.Rptr. 729, 404 P.2d 209]), or that of a custodian eavesdropping directly (*People* v. *Bazaure* (1965) 235 Cal.App.2d 21 at p. 34 [44 Cal.Rptr. 831]), or with the assistance of mechanical devices (*People* v. *Ketchel* (1963) 59 Cal.2d 503, 519-522 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Ross* (1965) 236 Cal.App.2d 364, 370-377 [46 Cal.Rptr. 41]; *People* v. *Boulad* (1965) 235 Cal.App.2d 118, 124-127 [45 Cal.Rptr. 104]; but cf. *People* v. *Ketchel* (1966) 63 Cal.2d 859, 867-868 [48 Cal.Rptr. 614, 409 P.2d 694].)

The cases last cited, and others, establish a principle which has been stated as follows: ''The deception itself does not render defendant's statements inadmissible, for it was not

[2] No issue has been raised as to any violation of defendant's rights under state or federal constitutional provisions against unlawful searches or seizures, or under state or federal statutes regulating communications by telephone or radio. (See *People* v. *Fontaine* (1965) 237 Cal.App.2d 320, 328-332 [46 Cal.Rptr. 855] wherein applicable state and federal precedents are collected and reviewed, in arriving at the conclusion that consent by one party to eavesdropping on and recording of a conversation precludes objection by the other; and *Ballard* v. *Superior Court*, 64 Cal.2d 159, 164, fn. 1 [49 Cal.Rptr. 302, 410 P.2d 838].)

of a type reasonably likely to procure an untrue statement. (*People* v. *Connelly*, 195 Cal. 584, 597 [234 P. 374]; *People* v. *Castello*, 194 Cal. 595, 602 [229 P. 855].)'' (*People* v. *Atchley* (1959) 53 Cal.2d 160, 171 [346 P.2d 764]; and see *People* v. *Lopez, supra;* 60 Cal.2d 223, 248; *People* v. *Ketchel, supra,* 59 Cal.2d 503, 520; *People* v. *Ross, supra,* 236 Cal. App.2d 364, 377; *People* v. *Boulad, supra,* 235 Cal.App.2d 118, 126-127; *People* v. *Stadnick* (1962) 207 Cal.App.2d 767, 772-774 [25 Cal.Rptr. 30, 99 A.L.R.2d 766]; *People* v. *Hughes* (1962) 203 Cal.App.2d 598, 601 [21 Cal.Rptr. 668]; *People* v. *Morgan* (1961) 197 Cal.App.2d 90, 93-94 [16 Cal. Rptr. 838].) ■ It is concluded that *Massiah* must stand only for the proposition that the prosecuting authorities cannot deliberately elicit incriminating statements from the indicted accused, in the absence of his counsel, either indirectly or directly. (See *People* v. *Brice* (1966) 239 Cal. App.2d 181, 189-192 [48 Cal.Rptr. 562].) In fact, *Massiah* is encompassed by the principles of *Escobedo* (see *People* v. *Boulad, supra,* 235 Cal.App.2d 118, 125-126). It may be assumed that the surreptitious use of the defendant's insurance broker in *Atchley,* the informer in *Lopez,* and the victim in *Hughes* to secure statements from the accused after his arrest is now proscribed, not only because of *Massiah* and *Arguello* and similar cases to which reference has been made, but also because the necessity of advising the defendant of his right to counsel and right to remain silent precludes the concealment of the identity of an interrogator who seemingly is not, but in fact is, an agent of the prosecuting authorities. *Massiah* does not, however, purport to deal with prearrest or preindictment interrogation, and, as indicated above, does not purport to lay down any general prohibition against surreptitious interrogation. Inquiry in the quest for delineation of the scope of the rights to counsel and to freedom from self-incrimination, and of the exclusionary rules designed to protect those rights is directed, therefore, to *Dorado* and its progeny.

At the time the authorities used the accomplice to interrogate the accused two of the elements of *Dorado* (62 Cal.2d 338, 353-359) were present: ''(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect''[3] and ''(4) the authorities had

---

[3]The fact that at the time of the first conversation there was one, and that at the time of the second conversation there were two confessed suspects, does not preclude inquiry focusing on a third. (Cf. *People* v. *Stewart* (1965) 62 Cal.2d 571, 580 [43 Cal.Rptr. 201, 400 P.2d 97];

not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'' There remains for interpretation and application the following requirements: ''(2) the suspect was in custody'' and ''(3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements,'' together with the related question of whether the process of ''investigation has shifted from the investigatory to the accusatory stage.'' (See 62 Cal.2d 338, 354-355; and *Escobedo* v. *Illinois, supra,* 378 U.S. 478, 492.)

The question has been resolved by *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838]. Therein a similar contention was made in respect to admissions secured from monitored conversations between the victim and the suspect. The petitioner sought discovery of the names of witnesses to determine '' 'whether or not the accusatory stage had been reached at the point where the complained-of tape recordings were made.' '' (64 Cal.2d at p. 168.) The court stated: ''By specifying the arrest as a requirement for the advent of the accusatory stage, we necessarily retained custody as a requisite; an arrest includes custody. (Pen. Code, § 834.) At no time have we discarded custody as an essential element of the accusatory stage. The dangers that *Escobedo* and *Dorado* sought to deter, such as coercion, can only take place if a suspect is in custody.'' (P. 169.) It concluded: ''Since petitioner was clearly not in custody at the time he uttered the incriminating statements to the victim, he cannot successfully challenge the admissibility of those statements on the basis of *Escobedo* and *Dorado*. Consequently, petitioner's invocation of possible *Escobedo* and *Dorado* issues to justify discovery in the instant case must fail.'' (P. 170.)

It is concluded herein that present existing decisions under the *Dorado-Escobedo* principles do not preclude the use of the testimony of the accomplice and the officer and the tape recording of the defendant's admissions as it was obtained under the circumstances of this case. (See also: *People* v. *Jones* (1966) 237 Cal.App.2d 499 [47 Cal.Rptr. 40].)

There remains for consideration the testimony relating to a conversation between the defendant and Mount.

The investigating officer testified that he first learned of Mount's participation in the fire around December 6th, and

---

*People* v. *Mathis* (1965) 63 Cal.2d 416, 431-432 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Furnish* (1965) 63 Cal.2d 511, 516-517 [47 Cal. Rptr. 387, 407 P.2d 299].)

that he took a statement from him on December 16th after advising him he could be prosecuted and that he was not offered any leniency. Mount was present and overheard Cole's portion of the December 18th telephone call from Cole to defendant. Thereafter, he was equipped with a broadcasting apparatus, and was followed by the officer with receiving and recording equipment. Mount met defendant at his house and spent about an hour and a half or two hours with him, of which about 45 minutes was at an inn whither they had gone in Mount's car. Mount and the officer each identified a tape as containing a partially comprehensible recording of the conversation. There was no audible recording of the conversation at the inn, but according to Mount there was no discussion there concerning the burned house.

Mount confirmed that the purpose of the visit was to get evidence against defendant concerning the fire. He stated that on arriving at defendant's house he walked up to the door and greeted him; that defendant did not appear to have been drinking; that he had some beers at the inn, but did not appear intoxicated at any time during the evening. Mount admitted that he falsely represented to defendant that Cole had sent somebody by his (Mount's) house who told him Cole was plenty mad and was going to turn defendant over to the authorities if he didn't get him some money; that the idea of making this representation was suggested by Cole's phone call of the 18th; that no direct suggestions were made to him as to how he should talk to defendant by the investigating officer or the district attorney, but that he learned the details from what he heard them say to Cole, and what he overheard Cole say on the telephone.

The prosecution offered the second side of the tape, of which the officer had said "most of it is audible." The defendant objected on the grounds that there was no showing that his statements were free and voluntary; that the evidence showed the tape related only portions of the conversation; that the prosecution's offer itself was improper in that it related to only a portion of the tape; and that it contained material which was prejudicial to the defendant. The objections were overruled and the playing of the tape commenced, only to be interrupted by defendant's objection that many parts of it were unintelligible, and that it was prejudicial to defendant to just have portions of the conversation before the jury. In response to the court's inquiries the jury indicated they were having a very difficult time hearing and understanding the tape, and in fact did not understand a substantial portion of it.

The judge acknowledged that that which he heard was not very intelligible, but over the defendant's objection permitted the prosecutor to commence playing the tape again at a different volume. How much was played does not appear. The court then interrogated the jury which responded that they did not hear very much of it; and one juror opined: "[I]t's not enough that we can understand it. There isn't enough that we can understand it to tie it together and to really be fair about it." The court thereupon sustained the defendant's objection and admonished the jury to disregard what they had heard of the tape. The prosecutor represented that a portion of the tape which had not been played was more intelligible and sought to play it. The court, after again getting the views of the jury, refused to entertain the suggestion. Out of the presence of the jury the prosecution again attempted to play the tape, after removing an amplifier, but the court ruled that it was "sufficiently unclear as to not to permit it to go to the jury." Before anything was played the parties stipulated that the reporter could transcribe the portion which was played to the jury at a later time. The only reference to this material in the record is a note inserted at the last playing which occurred out of the presence of the jury: "(Tape recording played, unintelligible to the reporter.)" Although proceedings were taken before the lower court to correct or augment the record, a transcript or statement of the intelligible matter elicited from the second tape has never been prepared. For all practical purposes the sound track played can only be considered as unintelligible.

The prosecutor then moved for permission to reopen his case to recall to the stand, not the eavesdropping officer who could furnish corroborating testimony, but Mount himself to testify to the conversation with defendant. Defendant objected on the ground the witness had remained in the courtroom, in violation of the court's order for exclusion of witnesses, after concluding his testimony the previous afternoon. A dispute as to whether Mount had in fact remained in the courtroom produced conflicting testimony from him as to whether he remained seated in the courtroom after testifying. Defendant further objected on the grounds that the witness admittedly had refreshed his recollection by listening to a tape which had been demonstrated as only capable of reproducing a portion of the conversation. No further objection, other than as to the form of the questions, was interposed.

Mount thereupon related the following concerning his conversation with defendant: "Mr. Bowman had told me that

he had had a phone call earlier from Cole and he said that he did not want to talk to Cole on account that he was wired up. And then is when I told him that the man had been by my house and that Mr. Cole was mad. And he said he didn't care how mad Cole was that he would take his chances. And he said that Cole couldn't afford to do any talking, that would get him five to ten years more. And he said the only one that he had talked to about the fire other than Cole was myself. He said, and that I could not afford to say anything because I had a wife and four children.''

. . . . . . . . . . . .

''He said that he was drunk when he had told Cole to burn the house.''

. . . . . . . . . . . .

''. . . Mr. Bowman had told me when he said that things wasn't turning out for him to help Red, or Mr. Cole, that he had paid him $247.00, if I recall right. . . . He said that it was paid in cash and there was no way that it could be traced.''

█ Defendant did not advance the lack of counsel (*Escobedo*) objection to Mount's testimony regarding his admissions. In view of the fact that he advanced it as to the conversations with Cole, it may be assumed he was aware of it and waived it by failure to so assert it. Even if it be preserved to him as a doctrine too novel to assert at the trial (*People* v. *Hillery* (1965) 62 Cal.2d 692, 711-712 [44 Cal.Rptr. 30, 401 P.2d 382]), the conclusions set forth above, in reference to the admissibility of evidence of the conversation with Cole, are applicable and demonstrate that there was no error in receiving this testimony.

█ Before examining defendant's other contentions in regard to this line of evidence it may be observed that the People's assertion that the defendant stipulated to the admission in evidence of the tape recordings of the Cole conversations is predicated upon a narrow construction of the record. The court announced that it was stipulated that the telephone call conversations may be listened to and recorded and transcribed in the record. A review of the record reflects that defendant's consent was not a waiver of his objections, but merely an assent that the tape itself, as distinguished from the sounds it emitted, could be received in evidence, and that the reporter could transcribe its contents, as he did, later. As noted, a similar stipulation in connection with the tape of Mount's conversation proved abortive, and demonstrates the desirability of reporting as the recording is played. (See:

*People* v. *Mulvey* (1961) 196 Cal.App.2d 714, 719 [16 Cal. Rptr. 821].)

■ Defendant's objections which are predicated on the alleged failure of the prosecution to show that the admissions elicited from him were not involuntary (see: *People* v. *Trout* (1960) 54 Cal.2d 576, 586 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418] ; *People* v. *Atchley, supra,* 53 Cal.2d 160, 170; *People* v. *Brown* (1961) 198 Cal.App.2d 253, 257-263 [17 Cal. Rptr. 789] ; and cf. *Leyra* v. *Denno* (1953) 347 U.S. 556, 561 [74 S.Ct. 716, 98 L.Ed. 948]) is not sustained by the record. There is no magic in a witness' use of the words "free and voluntary." The court had before it the testimony of the officer and of those who engaged in the conversation in regard to the manner in which the statements were elicited, and it also appears that the judge had listened to the tapes before ruling on their admissibility. It properly concluded from the circumstances that sufficient foundation existed. (*People* v. *Atchley, supra,* 53 Cal.2d at p. 171.) The jury was correctly instructed to disregard any admissions unless it found they were voluntarily made (see fn. 2, *ante*), and the deception itself did not render defendant's statements inadmissible. (*People* v. *Atchley, supra.*)

■ Defendant's further objections allege prejudice in the use of the unintelligible tape. Here the court followed the precept that to be admissible in evidence the conversations as recorded should be audible and intelligible. It properly excluded the second tape. (See: *People* v. *Mulvey, supra,* 196 Cal.App.2d 714, 720; and *People* v. *Stephens* (1953) 117 Cal. App.2d 653, 660 [256 P.2d 1033].) Unfortunately, this decision was arrived at in the presence of the jury after twice playing the tape to determine its intelligibility. Defendant's claim of prejudice from permitting the jury to hear what, if anything, was intelligible on the tape cannot be sustained. In the first place, "In the absence of a transcription, which should have been made, it is impossible to know whether the irregular proceedings were harmful." (*People* v. *Mulvey, supra,* 196 Cal.App.2d 714, 720; *People* v. *Wojahn* (1959) 169 Cal.App.2d 135, 145-146 [337 P.2d 192] ; *People* v. *Dupree* (1957) 156 Cal.App.2d 60, 68 [319 P.2d 39].) Secondly, the judge carefully admonished the jurors at the time to strike anything they might have heard from their minds; and subsequently reminded them to disregard any evidence which was stricken. Finally, the jurors' interest in and reliance on the telephone conversations with Cole indicate that there could

have been no prejudice from undisclosed revelations of the defendant to Mount which may have erupted from the otherwise unintelligible tape.

The fact that Mount heard the tape during the week of the trial, and presumably refreshed his recollection from what could be deciphered therefrom, is not grounds for error.

Although a witness may not withhold the whole of notes from which his recollection is refreshed by producing only a summary of favorable facts (*People* v. *Vigghiany* (1960) 181 Cal.App.2d 621, 625-629 [5 Cal.Rptr. 501]), there is no principle which precludes a witness from refreshing his recollection from such aids as are available, even though they only cover a portion of the conversation or event to which he testifies. (*People* v. *Wootan* (1961) 195 Cal.App.2d 481, 485 [15 Cal.Rptr. 833]; *People* v. *Wojahn, supra,* 169 Cal. App.2d 135, 141-142 and 145; and see *People* v. *Ketchel, supra,* 59 Cal.2d 503, 519; and *People* v. *Dupree, supra,* 156 Cal.App.2d 60, 68.)

When the tape was excluded as unintelligible the prosecutor called the witness as was suggested in *Stephens* (117 Cal.App.2d at p. 660). The objection that Mount should not testify because he had remained in the courtroom was resolved by the court's finding that he had not. In any event, whether an exception should be made to such an order rests with the sound discretion of the trial court. (*People* v. *Kroeger* (1964) 61 Cal.2d 236, 246 [37 Cal.Rptr. 593, 390 P.2d 369].) No abuse of discretion can be shown herein, where, if present, the witness only would have heard some of the investigating officer's testimony, and nothing relating to the substance of that to which he was recalled to testify.

*There was no error in receiving the*
*assistant fire chief's opinion*

Defendant contends that the trial court erred in permitting the assistant fire chief to testify that the fire most likely started closer to the north wall of the service porch where the old type cooler was, because his opinion was based on hearsay and otherwise lacked foundation. The record discloses that he was on the scene, watched the course of the fire, and examined the premises carefully after the fire was out. A chance remark that an explosion had been reported was objected to, and the jury were properly admonished that it should not be considered as fact, as distinguished from a report. The fact that the windows had blown out in the back was subsequently established by further testimony. The opin-

ions of the witness based on his personal observation were properly received. (*People* v. *Lockhart* (1962) 200 Cal.App. 2d 862, 872-873 [19 Cal.Rptr. 719]; *People* v. *Holman* (1945) 72 Cal.App.2d 75, 91-92 [164 P.2d 297].)

The People's proposed intsruction on expert testimony was not given, but in view of the fact that there was no issue raised as to the location at which the fire commenced, no prejudicial error can be predicated upon the receipt of the opinion or the failure to instruct.

*The trial judge did not show bias or partiality in favor of the prosecution*

In his opening brief the defendant alleges: "The Trial Judge by his comments, rulings and treatment of prosecution witnesses showed a bias or partiality in favor of the prosecution which could not help but influence the Jury. He assisted prosecution witnesses in reconciling inconsistent statements, and exhibited indifference to the fundamental rights of Appellant." No particulars, other than the alleged errors in rulings which are otherwise herein discussed, are specified. This court is not required to search the record to establish the existence or nonexistence of error, and the general charge may be disregarded in the absence of a reference where the alleged errors, or any of them, may be found in the transcript. (*People* v. *Reinard* (1963) 220 Cal.App.2d 720, 733-734 [33 Cal.Rptr. 908]; *People* v. *Brown* (1960) 184 Cal. App.2d 588, 595 [7 Cal.Rptr. 717]; *People* v. *Mike* (1958) 163 Cal.App.2d 466, 468-469 [329 P.2d 519].)

Examination of defendant's lengthy statement of facts reflects a complaint that the court prompted the assistant fire chief when the latter was requested for his opinion as to where the fire started. The witness had already given his opinion, and the court in ruling on objections, concluded its remarks by questions directed to restoring the continuity of the testimony, but in no sense attempted to mold the content of the answers.

In his first statement, and in his closing brief, three other matters are suggested as establishing the general charge "that there was misconduct on the part of the trial judge, directed at defendant and his counsel, which worked a miscarriage of justice." (*People* v. *Black* (1957) 150 Cal.App.2d 494, 496-504 [310 P.2d 472]; and see *People* v. *Ramirez* (1952) 113 Cal.App.2d 842, 852-855 [249 P.2d 307]; *People* v. *Frank* (1925) 71 Cal.App. 575, 581-586 [236 P. 189].)

In the first place, he points to "the court's . . . deter-

mined refusal to exclude the recording'' of Mount's conversation with defendant. The record reflects that counsel and the judge listened to a playing of the tape out of the presence of the jury at the end of the second day of trial. The court remarked when one side of the tape was offered at the close of the third day: "That is a very tiring recording to listen to. I have listened to it, ladies and gentlemen, and you are going to have to listen carefully and attentively. I hope your hearing is sharper than mine. Audible is all it is. There's a lot of problems in it.'' The next day defendant did not object on the grounds that it was substantially all unintelligible, but persisted in the objections that if any of the other side of the tape was audible it should be played also, and, in the alternative, that if the tape was inaudible in any part, the whole should be excluded, because that remaining did not represent the whole conversation. (See Code Civ. Proc., § 1854; *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 851-853 [3 Cal.Rptr. 459].) The court properly ruled that if a substantial part of the conversation could be heard, and had some substance which could stand independently, it should be admitted. (*People* v. *Ketchel, supra,* 59 Cal.2d 503, 519; *People* v. *Wootan, supra,* 195 Cal.App.2d 481, 485; *People* v. *Wojahn, supra,* 169 Cal.App.2d 135, 145; and *People* v. *Dupree, supra,* 156 Cal.App.2d 60, 68.) At the time it appeared that the trial judge was advised from the testimony that most of the second side was audible, and that from the prior audition, despite his reservations expressed above, he understood that the last half hour of the recording was a continuous intelligible conversation. When the reproduction proved unintelligible, as confirmed by the jury, the court did accede to the prosecution's request to attempt it again with lower volume. The granting of this request does not appear unreasonable or demonstrative of prejudice in view of the fact that the court, among others, had heard the portion of the tape referred to on previous playings. Other objections to the court's rulings on this phase of the case have been treated above, and add nothing to the claim of bias or partiality.

▇▇ Secondly, defendant claims that the court demonstrated partiality in permitting Mount to be recalled as a witness, and particularly in the proceedings to establish whether or not he had complied with the court's order excluding witnesses. It has been demonstrated that the latter point is immaterial as the court in its discretion can control the exclusionary order and the penalties for breach thereof. It would have been an abuse of discretion to refuse the right to

recall Mount when the mechanical record of the conversation in which he participiated proved worthless. (See *People* v. *Stephens, supra,* 117 Cal.App.2d 653, 660.) The trial judge could well have heard the evidence and argument on the question of Mount's compliance with the exclusionary order, out of the presence of the jury. He also might well have refrained from expressing his own views on Mount's presence in, or absence from the courtroom, and from conducting the examination of the witness himself. An examination of the record reflects, not that the court was attempting to assist the prosecution's case, but that it was attempting to vindicate its own recollection that Mount had left the courtroom. It is impossible to determine whether the discrepancy in the testimony of Mount was induced by his own desire to assist the prosecution, or by a misunderstanding as to whether he spent all of the time he remained in the area, or only a portion thereof in the courtroom.

Finally, it is asserted that bias and prejudice were evinced by the court in asking questions of Mount when he was under cross-examination. Defendant had established from Mount's lips that after the fire he had received no payments other than $100 from Cole for any purpose, and sought to impeach him by showing that in his statement to the investigating officer he had related that he had received $50 from Cole during that period for the use of his car, or driving Cole in connection with another fire. The court properly was attempting to prevent reference to the other fire, and after conference with counsel, permitted a general question without reference to the purpose of the services rendered. Mount answered: "This was this $50.00 in here? [Apparently referring to a written copy of his statement.] That wasn't from the fire of Mr. Bowman." Defendant sought to press the question, and the court interjected to suggest that by reference to the $100 the witness was referring to the Bowman matter alone— a suggestion which was readily adopted by the witness, who then conceded that he had received the other $50. In *People* v. *Ramirez, supra,* the opinion recites: " '[Y]our Honor, I want to object to your leading the witness and pulling him out of a hole every time; because this man is on cross-examination, the very veracity of his statements is at stake here, and this Court has—and may the record so show—interrupted the testimony and led the witness as to what he means; and I believe that that is improper, your Honor, and I say, with the utmost respect for this court—' The reference to the

trial judge's conduct is supported by the record not only once but numerous times; the objection was warranted although delayed. Incidentally, it is the function and duty of the district attorney to conduct the prosecution and the defendant's attorney the defense.'' (113 Cal.App.2d at p. 852; and see *People* v. *Boggess* (1924) 194 Cal. 212, 239-241 [228 P. 448]; *People* v. *Robinson* (1960) 179 Cal.App.2d 624, 631-637 [4 Cal. Rptr. 50]; *People* v. *Campbell* (1958) 162 Cal.App.2d 776, 786-787 [329 P.2d 82]; *People* v. *Huff* (1955) 134 Cal. App.2d 182, 184-188 [285 P.2d 17].)

On the other hand, it is stated: ''The duty of a trial judge, particularly in criminal cases, is more than that of an umpire; and though his power to examine the witnesses should be exercised with discretion and in such a way as not to prejudice the rights of the prosecution or the accused, still he is not compelled to sit quietly by and see one wrongfully acquitted or unjustly punished when a few questions asked from the bench might elicit the truth. It is his primary duty to see that justice is done both to the accused and to the people. He is, moreover, in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench.'' (*People* v. *Golsh* (1923) 63 Cal.App. 609, 614-615 [219 P. 456]; and see *People* v. *Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; *People* v. *Corrigan* (1957) 48 Cal.2d 551, 555 [310 P.2d 953]; *People* v. *Williams* (1962) 200 Cal. App.2d 838, 846-847 [19 Cal.Rptr. 743]; *People* v. *Morris* (1956) 138 Cal.App.2d 317, 324-327 [292 P.2d 15].)

When the judge figuratively descends from the bench and enters the arena he takes the risk that he will be besmirched with gore or sawdust, and that he will be criticized as interfering either on behalf of the bull or the matador. The difficulty of determining where legitimate inquiry ends and advocacy commences is exemplified by a comparison of the foregoing cases, and more succinctly by the division of opinion within some. (See *People* v. *Rigney, supra,* 55 Cal.2d at p. 244, and dissent pp. 247-248; *People* v. *Corrigan, supra,* 48 Cal.2d at p. 559, and dissents pp. 560-563; and *People* v. *Williams, supra,* 200 Cal.App.2d 838, 846-847.)

Despite freedom from the obligation so to do, in view of the serious charges made against the trial judge, the record has been examined with a particularity to determine the extent and manner in which he participated in the case, both in ruling on the legal questions presented to him, and in

the presentation of evidence to the jury. It is concluded that the zeal which was exhibited by what might be considered more than ordinary participation for a judge in a jury trial, was not only inspired by desire to see that justice was done, both to the accused and to the People, but, also, objectively, could leave no other impression with the jury.

It is noteworthy that the court not only fully instructed the jury concerning the respective functions of court and jury, but also particularly admonished the jury not to draw any indications one way or another from his conduct.[4] It must be assumed that the jury heeded the admonition. (See *People* v. *Corrigan, supra,* 48 Cal.2d 551, 556.)

*The prosecutor did not violate appellant's constitutional privilege against self-incrimination*

 In the course of his opening argument to the jury the prosecutor stated: "We are presently concerned with a charge against a man who, as far as I am concerned I have no respect for. I have some respect for a man like Cole. I disapprove of his entire background but at least he's a guy that's got guts enough to say, 'I did it.' As against that we have got the kind of guy who goes out and hires somebody else to do his dirty work then says nothing." The defendant promptly objected, and requested the court to cite the district attorney for misconduct and to admonish the jury to disregard it. The court thereupon addressed the district attorney and the jurors, respectively, as follows: "Well, I suppose, Mr. Pease, you ought to refrain from commenting to that extent. Ladies and gentlemen, the defendant has the right not to testify here if he wishes not to. So to that extent you must take it into consideration. So, Mr. Pease, will you refrain from commenting too much in that nature."

Defendant contends: "The comment of the District Attor-

---

[4]The instruction reads in part: "Now, ladies and gentlemen, I always say this in the course of a jury trial. I like to think that I am a human being, too. And I will sit up here and undoubtedly at times frown, nod, smile and do other things that people do. Do not let any of these things indicate anything to you. I have not intended that any frown or smile or nod of mine have meant anything at all. You have to make your own decision here. Also, do not infer anything from the fact that I may have at times gotten a little intense with these attorneys. That also happens in every trial. And sometimes I pick on one more than the other, not intentionally, but because maybe there are more problems on that side. I have great respect for these gentlemen and don't let that indicate anything to you. In other words, just don't let any mannerism or conduct of mine indicate anything to you except as I have stated the law to you."

ney on the failure of the Appellant to testify in his own behalf and the acquiescence in the same by the Trial Court prevented Appellant from receiving a fair trial. The courage of the oft convicted felon in admitting his part in the alleged crime is described in glowing terms and Appellant's silence is unfavorably compared with it." (See: *Griffin* v. *California* (1965) 380 U.S. 609, 610-611 and 613 [85 S.Ct. 1229, 14 L.Ed.2d 106]; *People* v. *Bostick* (1965) 62 Cal.2d 820, 823 [44 Cal.Rptr. 649, 402 P.2d 529]; *People* v. *Sigal* (1965) 235 Cal.App.2d 449, 456 [45 Cal.Rptr. 481]; *People* v. *Parker* (1965) 235 Cal.App.2d 100, 106-107 [44 Cal.Rptr. 909].)

The record further reflects that the case was tried on the theory, subsequently established in *Griffin*, that *Malloy* v. *Hogan* (1963) 378 U.S. 1 [84 S.Ct. 1489, 1 L.Ed.2d 653], which extended the privileges and prohibitions of the Fifth Amendment of the federal Constitution to proceedings taken by a state, precluded such comment. (Cf. *People* v. *Modesto* (1965) 62 Cal.2d 436, 447-454 [42 Cal.Rptr. 417, 398 P.2d 753].) Defense counsel in his argument advised the jury that defendant could rely upon the lack of evidence produced by the prosecution and that it could not infer anything against him from his failure to testify. The matter was highlighted at that time by the court's summary rejection of the prosecutor's interjected objection. The court instructed the jury: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failures, if any, of the People to prove every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support by itself a finding against him on any such essential element." Reference to the record reflects that an instruction in the language of CALJIC (rev. ed. 1958) No. 51, which was offered on behalf of the People was modified by deleting all but the first two sentences.

The prosecution contends that the argument was not violative of the comment rule, as it was merely made to bolster the testimony of Cole, by comparison, and not to request that an inference be drawn against defendant. Be that as it may, it is apparent from the record set forth above that there was no prejudice to defendant from that reference. (See *People* v. *Cotter* (1965) 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862]; *People* v. *Bostick, supra,* 62 Cal.2d 820, 823-827.)

*The prosecutor did not commit any other prejudicial
misconduct in his argument to the jury*

Defendant complains that the district attorney made
prejudicial statements in his closing argument which were not
sustained by the evidence. In commencing for the final time
his review of the events, the district attorney said: "You have
got a situation here where all of the testimony is pretty clear,
I think, that there was a considerable amount of drinking
going on the day the fire started." Then ensued the following
colloquy: "MR. STANLEY: I didn't hear that in the evidence,
Your Honor. MR. PEASE: I think Mr. Mount was testifying to
that. THE COURT: I don't know if it came out in that fashion.
MR. STANLEY: I didn't hear it. MR. PEASE: If not, I will
apologize. It was my recollection. I could be wrong. THE
COURT: All right." The statement is not supported by the
record. The court instructed the jury that the statements of
the attorneys were not evidence on numerous occasions: at
the opening of the trial; before the attorneys commenced their
argument; during the course of defendant's argument; shortly
after the incident of which complaint is made in specific refer-
ence to the same subject matter; again during the closing
argument; and finally in its closing instructions. On this
record, and considering the concession made by the district
attorney in the quoted statement, no reversible error can be
found.

In discussing the effect of defendant's state of sobriety at
the time he first approached Cole (Mount had testified the
defendant said that he was drunk when he told Cole to burn
the house),the district attorney stated: "Mr. Stanley in his
opening statement said that he was an alcoholic." This state-
ment finds no support in the record. The defendant's objec-
tion went to the general statements concerning drinking on
the day of the fire, hereinabove discussed, and no attempt was
made to correct the allegation at that time. The court, as noted
above, promptly cautioned the jury on the former point, and
it is to be presumed that it would have done so as to the latter
error if it had been properly called to its attention. In fair-
ness to the prosecution it is noted that the record does disclose
that defendant instigated questioning of Mount which was
designed to bring out that defendant was intoxicated on
December 18th; and in his argument to the jury suggested
that if they believed defendant's admission to Mount they
should take it as a whole and consider the lack of intent if
he were drunk. An instruction on the effect of intoxication

on intent was given. (CALJIC No. 78-A, mod.), but the record fails to reveal by whom it was proposed. Defendant offered a definition of voluntary intoxication (CALJIC No. 78-D) which was refused, so it may be inferred he was pressing the point. Under all these circumstances no prejudicial error is found.

In reference to Mount's credibility the district attorney commented as follows: "Now, stop and think what inducement there was to Mr. Mount to get up here and swear under oath that this is what happened and where he put himself. He has confessed from the stand that he was implicated in an arson and that's about the strongest confession anybody can make. He's put himself right in line for a charge for arson or aiding and abetting arson. And you recall that he said that there were no promises made to him of anything. No one promised him they would not file, no one promised him any kind of leniency, and no one did. And it took a lot of guts for that guy to stand up there and admit in front of you people, in front of the Court and all taken down by the court reporter and swear that this was the truth. What chance do you suppose he would have if he would go in and plead not guilty now and demand a jury trial?" Defendant objected then, and asserts in these proceedings, that there was no evidence of any charge against Mount, and that the statement implied, contrary to fact, that Mount was going to be prosecuted for the offense. Although the inference of which defendant complains may be improper, the People were entitled to show that at the time he gave his statement and cooperated with the authorities he was subject to prosecution. The error, if such it be, in applying the same inference to his testimony could not be prejudicial. Each left open to defendant the inference, which he seized upon, that Mount was buying himself immunity from prosecution for two fires. Although the prosecutor and the court indicated that there was no evidence that a complaint had not been filed, and Mount in fact had testified he had not been charged, the general instructions to the jury to disregard statements not sustained by the evidence, to which reference has been made, preclude further objection on this score.

### The court did not err in instructing the jury

Defendant first asserts that it was prejudicial error to fail to give instructions which he proffered on the definitions of the words "wilfully" (CALJIC (rev. ed. 1958) No. 75) and "maliciously" (*id.* No. 77) as used in the definition of

arson.[5] He points to the fact that his admission to Mount reflects that he was drunk when he allegedly told Cole to burn the house; he notes that the evidence fails to show that Cole ever expressly advised defendant that he was going to burn the house; and he contends therefrom that he never had the requisite purpose or intent. ▮ The trial court, of course, must charge the jury on all points of law pertinent to the issues if requested by either party. (Pen. Code § 1093, subd. 6; *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 595-596 [35 Cal.Rptr. 401]; *People* v. *McCartney* (1963) 222 Cal. App.2d 461, 474-476 [35 Cal.Rptr. 256]; *People* v. *Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134].) On the other hand, there is no requirement that the court instruct in the exact language submitted by the defendant, or that it give redundant or repetitious instructions. (*People* v. *Albert* (1960) 182 Cal.App.2d 729, 745-746 [6 Cal.Rptr. 473].)

▮ "It is true that the statutory definition of arson (Pen. Code, § 447a) requires that the act of setting fire to or burning be done maliciously. The word 'malice' imports 'a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, . . .' (Pen. Code, § 7, subd. 4.) When related to the crime of arson, the word 'malice' denotes nothing more than a deliberate and intentional firing of a building, or other defined structure, as contrasted with an accidental or unintentional ignition thereof; in short, a fire of incendiary origin." (*People* v. *Andrews* (1965) 234 Cal.App.2d 69, 74-75 [44 Cal.Rptr. 94].) ▮ From the foregoing it may be assumed that the court properly should have given the offered instructions. It did instruct on intent (CALJIC (rev. ed.1958) No. 71) and motive (*id.* (1962 supp.) No. 35 (rev.)) as requested by the defendant; and, as has been noted, on the effect of intoxication on intent. The jury necessarily must have understood that arson involved "a deliberate and intentional firing of a building." Moreover, the issue here was not whether arson was committed—the testimony of the accomplices was not controverted—but whether or not the defendant was a party to it. The court correctly instructed the jury regarding the requirements to establish that one is a principal in an offense which he did not directly or actively commit. (CALJIC

---

[5]The court instructed the jury: "In so far as it is applicable here, Section 447a of the Penal Code of California reads as follows: 'Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any . . . dwelling house . . . whether the property of himself or of another, shall be guilty of arson. . . .' "

(rev. ed. 1958) No. 91.) No prejudicial error can be predicated upon the failure to give the instructions in question.

■ Both the People and defendant offered an instruction on the testimony of accomplices in the words of CALJIC, Instruction No. 821 (rev. [1962]). The court modified the instruction and instructed the jury that Mount and Cole were accomplices. Defendant contends that this gives rise to the inference that the court was instructing the jury that the defendant was a principal as a matter of law. The instruction, however, reads: "An accomplice is one who is liable to prosecution for the identical offense charged against the defendant on trial," and does not purport to reflect on the latter's guilt or innocence. ■ Where, as here, the uncontradicted evidence shows that the witness committed the offense in question, it may be error to refuse to charge that he is an accomplice as a matter of law. (*People* v. *Luker* (1965) 63 Cal.2d 464, 472 [47 Cal.Rptr. 209, 407 P.2d 9].)

■ The defendant offered an instruction in the language of CALJIC (rev. ed. 1958) No. 52. He asserts that the refusal of the court to give this instruction left the jury inadequately instructed on the manner in which a witness can be impeached. A comparison of this instruction with the instruction given by the court, which was predicated upon the provisions of section 13 of article I of the state Constitution, and of section 1847 of the Code of Civil Procedure, fails to reveal any startling omissions. If there is any such, defendant has neglected to point it out to this court.

It is concluded that defendant has failed to demonstrate any prejudicial error in the manner in which the jury was instructed.

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.